**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PUBLIC INTEGRITY ALLIANCE, INC., an Arizona nonprofit membership corporation; BRUCE ASH, an individual; FERNANDO GONZALES, an individual; ANN HOLDEN, an individual; LORI OIEN, an individual; KEN SMALLEY, an individual, *Plaintiffs-Appellants*, | No. 15-16142 |
| | D.C. No. 4:15-cv-00138-CKJ |
| v. | OPINION |
| CITY OF TUCSON, a chartered city of the State of Arizona; JONATHAN ROTHSCHILD, in his capacity as the Mayor of the City of Tucson; REGINA ROMERO, in her capacity as a member of the Tucson City Council; PAUL CUNNINGHAM, in his capacity as a member of the Tucson City Council; KARIN UHLICH, in her capacity as a member of the Tucson City Council; SHIRLEY SCOTT, in her capacity as a member of the Tucson City Council; RICHARD FIMBRES, in his capacity as a member of the Tucson City Council; STEVE KOZACHIK, in his capacity as a | |

2    PUBLIC INTEGRITY ALLIANCE V. CITY OF TUCSON

member of the Tucson City Council;
ROGER RANDOLPH, in his capacity as
the Clerk of the City of Tucson,
                    *Defendants-Appellees*.

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted
August 11, 2015—San Francisco, California

Filed November 10, 2015

Before: Alex Kozinski and Richard C. Tallman, Circuit
Judges, and Lawrence L. Piersol,[*] Senior District Judge.

Opinion by Judge Kozinski;
Dissent by Judge Tallman

---

[*] The Honorable Lawrence L. Piersol, Senior District Judge for the U.S.
District Court for the District of South Dakota, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's judgment in favor of the City of Tucson in an action challenging the constitutionality of Tucson's hybrid system for electing members of its city council.

Tucson is divided into six wards of approximately equal population, and each ward is allotted one seat on the city council. Under the first step of the hybrid system each ward holds its own primary limited to residents of that ward. The winners of the ward primaries advance to the general election, where they compete against the other candidates nominated from that ward. In the general election, all Tucson residents can vote for one council member from each ward that held a primary during the same election cycle.

The panel first held that in determining the system's constitutionality, the primary and general elections must be considered in tandem as two parts of a single election cycle, rather than two separate contests judged independently of one another.

The panel determined that the practical effect of the Tucson system is to give some of a representative's constituents—those in his home ward—a vote of disproportionate weight. That is the very result the Supreme Court's one person, one vote jurisprudence is meant to

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

foreclose. The panel held that every otherwise eligible voter who will be a constituent of the winner of the general election must have an equal opportunity to participate in each election cycle through which that candidate is selected.

The panel rejected Tucson's argument that the hybrid system is a reasonable "residency restriction" on the right to vote. The panel held that when two groups of citizens share identical interests in an election, the city may not use a residency requirement to exclude one group while including the other. The panel concluded that excluding out-of-ward voters from the primary election discriminates among residents of the same governmental unit in violation of the Equal Protection Clause of the Fourteenth Amendment.

Dissenting, Judge Tallman stated that the Constitution does not require Tucson to draw its district borders in a particular way for different local elections. He concluded that Tucson's hybrid system is constitutional, and the majority erred in holding otherwise.

---

## COUNSEL

Kory A. Langhofer (argued), Thomas J. Basile and Roy Herrera, Jr., Brownstein Hyatt Farber Schreck, LLP, Phoenix, Arizona, for Plaintiffs-Appellants.

Michael G. Rankin, City Attorney, Dennis McLaughlin (argued), Principal Assistant City Attorney, Office of the Tucson City Attorney, Tucson, Arizona, and Richard Rollman, Gabroy Rollman & Bosse PC, Tucson, Arizona, for Defendants-Appellees.

**OPINION**

KOZINSKI, Circuit Judge:

We consider the constitutionality of Tucson's unusual system for electing members of its city council.

**FACTS**

Tucson's elections are ordinary in many ways.  The city is divided into six wards of approximately equal population, and each ward is allotted one seat on the city council.  A candidate for city council must run for the seat in the ward where he resides.  *See* Tucson City Charter ch. III, § 1; ch. XVI, §§ 5, 8, 9.  From there, things take an odd turn.

In some American cities, council seats are filled at large, with the entire city voting for each seat in the primary and general elections.  In other cities, council members are nominated and elected by the residents of particular districts. Tucson splits the difference:  Since 1930, the city has used a "hybrid system" that combines ward-based primaries with at-large general elections.

The first step in the hybrid system is a partisan primary. Each ward holds its own primary limited to residents of that ward.  The winners of the ward primaries advance to the general election, where they compete against the other candidates nominated from that ward.  In the general election, all Tucson residents can vote for one council member from each ward that held a primary during the same election cycle. *See* Charter ch. XVI, § 9.  Thus, a resident of Ward 1 can't vote in the Ward 2 primary, but *can* vote for one of the Ward 2 candidates in the general election.  The parties agree that,

once elected, council members represent the entire city, not just the ward from which they were nominated. *See City of Tucson* v. *State*, 273 P.3d 624, 631 (Ariz. 2012) ("Tucson council members, although nominated by ward, represent the entire city, just as do council members elected at large in other cities."); *see also Dallas Cty.* v. *Reese*, 421 U.S. 477, 480 (1975) ("[E]lected officials represent all of those who elect them . . . ."); *Fortson* v. *Dorsey*, 379 U.S. 433, 438 (1965) (similar).

Council seats are filled in staggered elections, with three council members elected every other year. Once elected, a council member serves a four-year term. *See* Charter ch. XVI, §§ 3–4. The council members from Wards 1, 2 and 4 will be elected in 2015, and the council members from Wards 3, 5 and 6 will be elected in 2017. Because only half of the council seats are up for election in any given year, only half of Tucsonans can vote in a primary in each election cycle. And approximately 83 percent of the electorate that votes for any given council seat in the general election has no say in selecting the nominees competing for that seat.

Plaintiffs are five Tucson voters and a non-profit corporation called the Public Integrity Alliance (collectively "PIA"). PIA concedes that the city could use ward-based primaries and ward-based general elections without offending the Constitution. Similarly, the city could use at-large primaries and at-large general elections. But PIA argues that combining these two options into a hybrid system violates the federal and Arizona Constitutions[1] by depriving Tucson

---

[1] PIA alleges that the hybrid system violates the Free and Equal Elections Clause of the Arizona Constitution. Ariz. Const. art II, § 21. We have been cited no authority indicating that the rights guaranteed by

voters of their right to vote in primary elections for individuals who will ultimately serve as their at-large representatives. PIA sued the city seeking to enjoin the hybrid system and secure a declaration that the scheme is unconstitutional. The district court ruled in favor of the city. We have jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

We start by resolving a dispute between the parties that has a substantial bearing on our analysis and, ultimately, on the result we reach: Are Tucson's primary and general elections two separate contests, each governed by rules that must be judged independently of one another—as the city contends? Or are they two parts of a single election cycle, which must be considered in tandem when determining their constitutionality—as PIA claims? The difference matters a great deal. If the two elections were separate, PIA's constitutional objections would largely evaporate and this would become a simple case. This is so because there would be no mismatch between the voting constituency and the represented constituency in the two elections. It's only if we view the two elections as one that serious constitutional doubts arise.

Unfortunately, the easy solution is not available because it is perfectly clear that the two contests are *not* independent. Instead, they are complementary components of a single election. Although the two contests are separated in time by

---

that document differ from those guaranteed by the federal Constitution. Because PIA did not develop any state-law arguments in its appellate briefing, we consider the state-law claims abandoned. *See Greenwood* v. *F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994).

ten weeks, they are entirely co-dependent. Without the primary, there could be no candidate to compete in the general election; without the general election, the primary winners would sit on their hands. Because a candidate must win a primary in order to compete in the general election, the "right to choose a representative is in fact controlled by the primary." *United States* v. *Classic*, 313 U.S. 299, 319 (1941). Thus, the Supreme Court has held that the primary and general elections are a "single instrumentality for choice of officers." *Smith* v. *Allwright*, 321 U.S. 649, 660 (1944); *see Newberry* v. *United States*, 256 U.S. 232, 284–86 (1921) (Pitney, J., concurring in part) (noting that the primary and general elections are "essentially but parts of a single process").

Because the primary and general elections are two parts of a "unitary" process, *Allwright*, 321 U.S. at 660–61, a citizen's right to vote in the general election may be meaningless unless he is also permitted to vote in the primary. If a voter's preferred candidate is defeated in a primary from which the voter is excluded, the voter would never have the chance to cast a ballot for his candidate of choice. *Cf. Morse* v. *Republican Party of Va.*, 517 U.S. 186, 205 (1996) (invalidating registration fee for Virginia senatorial nominating convention because the fee limited voters' "influence on the field of candidates whose names [would] appear on the ballot" and thus "weaken[ed] the 'effectiveness' of their votes cast in the general election itself"); *Bullock* v. *Carter*, 405 U.S. 134, 146 (1972) ("[T]he primary election may be more crucial than the general election . . . ."); *Classic*, 313 U.S. at 319 (observing that "the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election"); *Ayers-Schaffner* v. *DiStefano*, 37 F.3d

726, 728 n.5 (1st Cir. 1994) (noting that "the ability to vote in the general election [is not] a satisfactory alternative for those voters not allowed to vote in the primary, as the candidate of their choice may have been excluded in the preliminary election from which they were barred").

This case illustrates the point. Although Arizona as a whole generally votes Republican, Tucson generally votes Democratic. This means that the Democratic nominee from each ward will likely win the general election regardless of whether the ward from which he was nominated is principally Republican or Democratic. Indeed, the city's current mayor and all six council members are Democrats. *See Tucson City Council Democratic Incumbents Re-Elected*, Arizona Public Media (Nov. 6, 2013), *available at* https://goo.gl/oMkOxi. In most cases, then, the Democratic ward primary is the only election that matters; the general election is a mere formality. Even if electing the Democratic nominee is not automatic, there is no dispute that the Democratic nominee enters the general election with an enormous advantage. Thus the vote in the primary—and particularly the Democratic primary— has a commanding influence on the outcome of the general election. Yet five-sixths of Tucson's voters have not even a theoretical possibility of participating in the primary that will, for all practical purposes, determine who will represent them in the city council.

The Supreme Court has indicated that, "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote" no matter where "their home may be in that geographical unit." *Gray* v. *Sanders*, 372 U.S. 368, 379 (1963). *Gray* defines the "geographical unit" by reference to the constituency of "the representative to be chosen." *Id.* at

10    PUBLIC INTEGRITY ALLIANCE V. CITY OF TUCSON

379; *see id.* at 382 (Stewart, J., concurring) ("*Within a given constituency*, there can be room for but a single constitutional rule—one voter, one vote." (emphasis added)).  All parties before us agree that the constituency of each Tucson council member is the entire city.  Thus, the relevant geographical unit is the city at large.  Because the constituency of the representative to be elected remains static throughout the election process, the geographical unit must also remain static throughout that process.[2]

If the city were permitted to change the geographical unit between the primary and general elections, it could decouple the representative to be elected from his constituency.  For example, Tucson could decree that only voters living on Main Street are eligible to vote in primaries, thereby forcing the

---

[2]    We are not persuaded by the city's reliance on two decades-old district court opinions that dealt with hybrid systems for judicial elections. *Holshouser* v. *Scott* and *Stokes* v. *Fortson* involved challenges to state laws providing that judges would be nominated from their districts but elected statewide in the general election.  In both cases, three-judge district courts ruled that the principle of one person, one vote is not applicable to judicial elections.  Both courts went on to observe that, even if that were not the case, the hybrid schemes would not violate one person, one vote because they didn't involve dilution or an unequal counting of votes.  *See Holshouser*, 335 F. Supp. 928, 930, 933 (M.D.N.C. 1971); *Stokes*, 234 F. Supp. 575, 577 (N.D. Ga. 1964).  The city argues that the Supreme Court's summary affirmance in *Holshouser*, 409 U.S. 807 (1972), is a ruling on the merits that requires us to uphold Tucson's hybrid system.  But a "summary affirmance without opinion in a case within the Supreme Court's obligatory appellate jurisdiction has very little precedential significance." *Dillenburg* v. *Kramer*, 469 F.2d 1222, 1225 (9th Cir. 1972).  It does not enshrine as Supreme Court precedent every stroke of the pen in the district court's opinion.  The summary disposition in *Holshouser* was likely intended to affirm the proposition that one person, one vote does not apply to judicial elections, as the Court eventually held in *Chisom* v. *Roemer*, 501 U.S. 380, 402–03 (1991).

entire city to choose among nominees selected by a tiny minority of residents.  Or the State of New York, in an effort to cap its number of city-slicker senators, could limit the primary for its junior senator to Manhattanites and the primary for its senior senator to the rest of the state.  We do not believe that such mismatches between voters at different stages of a single election cycle are constitutionally permissible.

Given the city's concession that each council member represents all of Tucson, it's clear that the representational nexus runs between the city and the council member, not between the ward and the council member.  But the hybrid system makes the tenure of each at-large council member largely dependent on the preferences of voters of his home ward; without their support, a council member could not be nominated (or re-nominated) in the first place.  Given that reality, each council member will be disproportionately responsive to voters from his home ward, especially those of his own party.  The city claims that this is a redeeming benefit of its hybrid system.  The exact opposite is true.  The practical effect of the Tucson system is to give some of a representative's constituents—those in his home ward—a vote of disproportionate weight.  That is the very result the Supreme Court's one person, one vote jurisprudence is meant to foreclose.  *See Reynolds* v. *Sims*, 377 U.S. 533, 560–64 (1964).  We cannot endorse an election system that encourages at-large representatives to prioritize kissing babies and currying favor in their home wards over the interests of their constituents who happen to live in other parts of the city.  As the Supreme Court itself has noted, an at-large representative "must be vigilant to serve the interests of all the people in the [city], and not merely those of people in his home [ward]."  *Fortson*, 379 U.S. at 438.

We hold that every otherwise eligible voter who will be a constituent of the winner of the general election must have an equal opportunity to participate in each election cycle through which that candidate is selected. Just as the city could not exclude a resident of Ward 1 from voting in the general election for his council member from Ward 2, so the city may not exclude that resident from a primary election for the same official. *See Allwright*, 321 U.S. at 664 ("[T]he same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election."); *Classic*, 313 U.S. at 318 ("[The] right of participation [in the nominating process] is protected just as is the right to vote at the election. . . .").

The city's final argument is that the hybrid system is a reasonable "residency restriction" on the right to vote. But when two groups of citizens share identical interests in an election, the city may not use a residency requirement to exclude one group while including the other. *See Town of Lockport* v. *Citizens for Comm. Action at the Local Level, Inc.*, 430 U.S. 259, 268 (1977) (residency requirements must be premised on a "genuine difference in the relevant interests of the groups that the state electoral classification has created"); *id.* (excluded group must be permitted to vote if it has "substantially identical interests" as included group); *Evans* v. *Cornman*, 398 U.S. 419, 422–26 (1970) (residents of federal enclave within Maryland couldn't be excluded from the franchise because they had "a stake equal to that of other Maryland residents"); *see also Holt Civic Club* v. *City of Tuscaloosa*, 439 U.S. 60, 72 n.8 (1978) (suggesting that a city might be required to enfranchise non-residents if it were "exercising precisely the same governmental powers over [them] as it does over those residing within its corporate

limits").[3]  In this case, the out-of-ward Tucsonans who are excluded from the ward primaries have precisely the same interests in those primaries as do the ward residents who are permitted to participate.  The nominees selected in the ward primaries will advance to the general election; if elected there, they will represent the entire city.  Because all Tucsonans have an equal interest in determining who the nominees will be, the city may not exclude out-of-ward voters from the primaries.

*Little Thunder* v. *South Dakota*, 518 F.2d 1253 (8th Cir. 1975), is instructive.  That case involved a challenge to South Dakota's scheme for governing its unorganized counties.  The residents of the unorganized counties were governed by elected officials in the nearest organized county, but only the residents of the organized county were allowed to vote for those officials.  The state defended this scheme as a reasonable residency requirement.  *Id.* at 1255.  In its view, the residents of the unorganized counties (who were mainly Native Americans) did not share the same interests in the elections as did the residents of the organized counties.  The Eighth Circuit rejected the argument.  Citing *Cornman*, that

---

[3]  Nothing we say has any bearing on the city's existing *candidate*-residency requirement, which requires each council member to run for the seat from the ward in which he resides.  *See* Tucson City Charter ch. XVI, §§ 5, 9.  The Supreme Court has twice upheld similar schemes.  *Dusch* v. *Davis*, 387 U.S. 112, 114–16 (1967); *Dallas Cty.* v. *Reese*, 421 U.S. 477, 480–81 (1975).  In light of *Dusch* and *Reese*, the city argues that we are bound to approve the *voter*-residency requirements imposed by the hybrid system.  But, despite the similarity in names, candidate-residency requirements are quite different than voter-residency requirements.  Neither *Dusch* nor *Reese* requires that the same constitutional principles governing candidate-residency requirements also apply to voter-residency requirements.  *See Dusch*, 387 U.S. at 115–16.

court held that a state may not use a residency requirement to prevent citizens from voting for "those who will function as their elected officials." *Id.* at 1258. The court applied strict scrutiny and invalidated the scheme. *Id.*

The fact that two groups live on opposite sides of a political boundary does not necessarily mean they can be treated differently for voting purposes. This is the teaching of *Little Thunder*. 518 F.2d at 1256; *see English* v. *Bd. of Educ. of Town of Boonton*, 301 F.3d 69, 77, 79 (3d Cir. 2002); *United States* v. *South Dakota*, 636 F.2d 241, 245 (8th Cir. 1980); *see also Holt Civic Club*, 439 U.S. at 81, 86 (Brennan, J., dissenting) (cautioning against "ced[ing] to geography a talismanic significance"). If two groups are represented by the same politician, they are necessarily part of a "single unit of local government." *Little Thunder*, 518 F.2d at 1256. Any boundary that purports to sub-divide that single unit is hopelessly arbitrary, and any "residency restriction" that disenfranchises citizens based on where they live in relation to that arbitrary boundary cannot stand. Excluding out-of-ward voters from the primary election discriminates among residents of the same governmental unit in violation of the Equal Protection Clause of the Fourteenth Amendment.

**REVERSED.**

---

TALLMAN, Circuit Judge, dissenting:

There are certain times when a federal court may tell a municipality how to run its local elections. This is not one of them. Tucson's hybrid election system does not invidiously

discriminate against voters based on their race, ethnicity, gender, or wealth.  Rather, plaintiffs argue—and the majority agrees—that Tucson unconstitutionally denies its citizens the right to vote by setting different geographical units for its councilmanic primary and general elections.  Because I conclude that the Constitution does not require Tucson to draw its district borders in a particular way for different local elections, I respectfully dissent.

## I

"The Constitution grants States broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices." *Clingman v. Beaver*, 544 U.S. 581, 586 (2005).  The United States Supreme Court has recognized that government "is the science of experiment" and that states are "afforded wide leeway when experimenting with the appropriate allocation of state legislative power."  *Holt v. City of Tuscaloosa*, 439 U.S. 60, 71 (1978) (citing *Anderson v. Dunn*, 6 Wheat. 204, 226 (1821)).  However, a state's power over its electoral procedures is not absolute and "must pass muster against the charges of discrimination or of abridgment of the right to vote." *Moore v. Ogilvie*, 394 U.S. 814, 818 (1969).

## A

Conspicuously absent from the majority's opinion is any mention of the appropriate standard of review.  In *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), the Supreme Court announced the standard for evaluating laws respecting the right to vote.  Although we typically invoke strict scrutiny to evaluate state laws that implicate fundamental rights, *Burdick*

requires courts to apply a more deferential level of scrutiny to most state election laws that abridge the fundamental right to vote. *Id.* at 433; *Dudum v. Arntz*, 640 F.3d 1098, 1113 (9th Cir. 2011) (recognizing that *Burdick* creates a sliding scale standard of review). Courts determine the appropriate level of scrutiny to evaluate a state election law by examining the burden the law imposes on voters' rights and then weighing that burden against the state's legitimate interest in maintaining the law. *Burdick*, 504 U.S. at 434 (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)); Lauren Watts, *Reexamining* Crawford*: Poll Worker Error as a Burden on Voters*, 89 Wash. L. Rev. 175, 180 (2014) (discussing the *Anderson*/*Burdick* framework).

"Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. Strict scrutiny review is appropriate only if the burdens are severe; otherwise, the state election law is constitutional so long as it is justified by a state's "important regulatory interests." *Id.*

**B**

The Supreme Court has been reticent to apply strict scrutiny to state election laws: It has done so only to evaluate discriminatory poll taxes, property ownership requirements for voting, and durational residency requirements. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665–70 (1966) (invalidating state poll tax); *Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 632–33 (1969) (holding that a state law requiring school district voters to own real property was unconstitutional); *Dunn v. Blumstein*, 405 U.S. 330, 335 (1972) (states must show a "substantial and compelling

reason" for imposing durational residency requirements). But, the Supreme Court has applied a lesser burden when evaluating the constitutionality of literacy tests, felon disenfranchisement laws, and voter identification laws. *See Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. 45, 50 (1959) (upholding state statute that conditioned voting eligibility on ability to read and write any section of the Constitution); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding the ability of states to disenfranchise felons); *Crawford v. Marion Cty.*, 553 U.S. 181, 202 (2008) (upholding constitutionality of state law requiring voter identification). In other words, the Supreme Court counsels us to approach the constitutionality of state election laws through a deferential lens. *See Burdick*, 504 U.S. at 433 ("Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections.").

Applying *Burdick*'s sliding scale of constitutional scrutiny, we have "repeatedly upheld as 'not severe' restrictions that are generally applicable, even-handed, politically neutral, and protect the reliability and integrity of the election process." *Dudum*, 640 F.3d at 1106 (citation omitted). Indeed, we have said that "voting regulations are rarely subjected to strict scrutiny," and we are particularly loathe to strike down as unconstitutional an entire election system. *Id.* at 1106, 1114.

## II

The majority concludes that Tucson's hybrid election system for electing its city council violates the "one person, one vote" principle announced in *Gray v. Sanders*, 372 U.S. 368, 380 (1963). According to the majority, Tucson's system

violates equal protection principles by designating different geographical units for its primary and general elections.  The practical effect of the majority's decision today is the total eradication of Tucson's voting system, which has been in place since 1930.  Tucson is now forced to choose between an entirely at-large method of election or a ward-only method of election despite the fact that a majority of Tucson citizens have *twice* before voted against adopting these election systems.  The Constitution does not require this sort of judicial highjacking of state power.  Accordingly, I conclude that Tucson's hybrid election system is constitutional. Several principles inform this conclusion.

## A

Constitutional standards must be satisfied in primary as well as in general elections.  *Smith v. Allwright*, 321 U.S. 649, 661–62 (1944).  However, individuals do not have an absolute right to vote in a primary election.  States may, for example, host a "closed" or "semiclosed" primary, in which only people who are registered members of a major political party may vote.  *See Clingman*, 544 U.S. at 584; *Nader v. Schaffer*, 417 F. Supp. 837, 850 (D. Conn. 1976), *aff'd mem.*, 429 U.S. 989; *see also Am. Party of Texas v. White*, 415 U.S. 767, 786 (1974) (holding that states may establish waiting periods before voters may be permitted to change their registration and participate in another party's primary).  In other words, the Constitution permits states to prohibit qualified individuals who are registered Independents (or who chose not to register as a party member) from voting in a primary election.

In fact, we have upheld Arizona's "closed primary" system in the face of a Fourteenth Amendment challenge

similar to Plaintiffs' challenge here. In *Ziskis v. Symington*, an independent voter "could not vote in the Arizona state primary election . . . because [Arizona law] denies any voter not affiliated with a political party the opportunity to vote in that party's primary." 47 F.3d 1004, 1004–05 (9th Cir. 1995). Ziskis sued the state in federal district court alleging that the law violated his Fourteenth Amendment right to vote. *Id.* at 1005. On appeal, we ruled in favor of the state. We held that the law did not overly burden Ziskis's right to vote because Ziskis could access the ballot by associating with a political party, and if Ziskis chose not to register, "his right to vote in the *general* election is unaffected." *Id.* at 1006. The Third Circuit recently resolved a similar Fourteenth Amendment challenge to New Jersey's closed primary system. *See Balsam v. Sec'y of N.J.*, No. 14-3882, 2015 WL 1544483, at *3 (3d Cir. Apr. 8, 2015). The court reasoned that voters do not "have a constitutional right to unqualified participation in primary elections," and the burden the closed primary system placed on plaintiff's rights was minor compared to the state's interests. *Id.* at *4–5.

While *Ziskis* and *Balsam* do not resolve the exact constitutional question presented here, they do counsel that primary and general elections are not on the same constitutional footing. *See* 26 Am. Jur. 2d *Elections* § 223 ("A primary election is one that results in nominations rather than final elections to office. Thus, a primary election serves a different function from a general election, in that it is a competition for the party's nomination, no more, no less, and does not elect a person to office but merely determines the candidate who will run for the office in the general election."). Primary elections in Tucson are, in short, nothing more than the means political groups use to choose the standard bearers who will face off in the general election.

## B

The majority finds it to be "perfectly clear" that Tucson's primary and general elections are not independent and "must be considered in tandem when determining their constitutionality." Yet, the cases the majority cites do not establish that primary and general elections must always be considered together. For instance, *United States v. Classic*, was an election fraud case where the federal government prosecuted certain state election commissioners for allegedly falsifying ballots in a Democratic primary. 313 U.S. 299, 307–08 (1941). *Classic* held that the Constitution secures the right to have one's "vote counted in both the general election and in the primary election." *Id.* at 322; *see also Smith*, 321 U.S. at 664–65 (holding that a political party may not create a "whites only" primary). However, *Classic* explained that the right it recognized only applied to voters who were "qualified" to cast votes in the state's Democratic primary. 313 U.S. at 315. Notably, *Classic* did not decide who was "qualified" to vote in the Democratic primary and left that distinction up to the state. *See id.* at 310–11.

*Classic* teaches us that Tucson cannot deprive a "qualified" voter from voting in a ward primary. However, Tucson retains broad discretion to decide who is "qualified" to vote in its primaries. Thus, *Classic* does not preclude Tucson from setting up ward-based primaries whose "qualified" voters are limited to the residents of that particular ward.

The majority cautions that "if the city were permitted to change the geographical unit between the primary and general elections, it could decouple the representative to be elected from his constituency." The majority creates two

hypotheticals to illustrate its point: First, Tucson could decree that only voters living on Main Street are eligible to vote in primaries.  Second, the State of New York could limit the primary for its junior senator to Manhattanites and the primary for its senior senator to the rest of the state.

But, an application of *Burdick*'s sliding scale of constitutional scrutiny reveals that neither of the majority's fictional state election systems would pass constitutional muster.  First, both of these hypotheticals eliminate large swaths of city residents from voting in *any* primary, which would likely be considered a "severe burden" on voting rights and subject to strict scrutiny under *Burdick*.  And second, the states would have an extremely difficult time articulating any sort of legitimate state interest in defense of these election systems.  Unlike the majority's hypothetical state election laws, Tucson's hybrid system gives each citizen the right to vote in her respective ward primary, and Tucson has articulated an "important regulatory interest" to support its hybrid system.

## C

*Gray v. Sanders*, 372 U.S. 368 (1963), is not as favorable to the majority's position as it assumes.  *Gray* held that states cannot construct election schemes so that one person's vote is weighed more heavily than another person's vote.  *Id.* at 380–81.  And, let there be no doubt about this—"[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote." *Id.* at 379.  However, the Supreme Court has never before held that the same geographical unit must apply to both the primary and general elections.

In asserting the contrary, the majority misreads *Gray* and views the case in a vacuum. Since *Gray*, the law on "one person, one vote" has dealt almost exclusively with congressional redistricting and malapportionment, *see, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 557 (1964), principles that are not at issue here. And, the Supreme Court has squarely rejected the notion that an individual has a right to vote in any election that might impact her life and livelihood. *See Holt*, 439 U.S. at 69 ("No decision of this Court has extended the 'one man, one vote' principle to individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions.").

*Gray* does not deprive states of their broad authority to set the geographical unit from which a representative is to be elected. *See Holt*, 439 U.S. at 68–69 (holding that city need not extend the franchise to the citizens of bordering municipalities, even though those citizens are subject to the city's criminal law jurisdiction); *see also Green v. City of Tucson*, 340 F.3d 891, 893 (9th Cir. 2003) (upholding Arizona's annexation law that "draws geographical distinctions" between voters living in unincorporated communities); *City of Herriman v. Bell*, 590 F.3d 1176, 1185 (10th Cir. 2010) ("[T]he state has the right to draw different boundaries for voting purposes—and we generally defer to these delineations—as long as the separate units further reasonable government objectives."). Simply put, *Gray* does not reach as far as the majority might wish.

## III

### A

From this it follows that Tucson's hybrid primary system does not "severely burden" the Plaintiffs' right to vote. During Tucson's primary election, the law ensures that each eligible voter within the relevant geographical unit—the ward—has an equal right to vote. The same holds true for the general election: Each eligible voter within the relevant geographical unit—the city—has an equal right to vote. Thus, the Plaintiffs are only entitled to vote in the primary election of the ward in which they reside. But, their right to vote in their ward primary is not burdened in any way. *See Holt*, 439 U.S. at 68–69.

The majority finds that "the practical effect of the Tucson system is to give some of a representative's constituents—those in his home ward—a vote of disproportionate weight." Not so. While a City Council member, once elected, is likely to be alert to the particular needs of his home ward, every single vote in Tucson's elections are weighted the same. In fact, the hybrid system's ability to foster attentiveness to local needs is precisely the reason it was created in the first place: the ward-based primary helps to ensure that *each* ward has a nominee for City Council who is aware of that ward's particular needs.

### B

When a state election law places no severe burden on voters' rights, "a [s]tate's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Clingman*, 544 U.S. at 593. Tucson has a

legitimate interest in ensuring geographic diversity on the City Council, and the hybrid system fairly advances this legitimate interest.  Specifically, Defendants persuasively assert:

> Having nominations through primary elections in each ward, using separate ballots for each party, allows the party electorates in each of those wards to make their own choice of a nominee, and simultaneously acts as a guarantee for the City electorate as a whole that each ward's nominee actually has support among the party members within that ward. Moreover, since nominees compete in the general election only against other candidates nominated in the same ward, see Compl. ¶ 24, ward nominations also help assure that each ward has a local representative on the council, and conversely, that the full Mayor and Council has members who are aware of each ward's issues, problems, and views . . . . The principal and adequate reason for providing for the election of one councilman from each borough is to assure that there will be members of the City Council with some general knowledge of rural problems to the end that this heterogeneous city will be able to give some due consideration to questions presented throughout the entire area.

This important regulatory interest is sufficient to justify any burden the hybrid system places on Plaintiffs' right to vote.

## IV

Tucson's hybrid system is constitutional, and the majority errs in holding otherwise. Supreme Court precedent teaches us that a municipality has broad authority to establish the relevant geographical units for its elections. *See Holt*, 439 U.S. at 68–69. Furthermore, the majority points to no case that requires a municipality to use the same geographical unit for both its primary and general elections, *cf. Gray*, 372 U.S. at 381, and the majority's holding to the contrary stretches the "one person, one vote" principle beyond its traditional application. Finally, because primary and general elections are not constitutionally equal, *see Balsam*, 2015 WL 1544483, at *3, state laws may narrow the franchise in a primary election without running afoul of the Fourteenth Amendment, *see Ziskis*, 47 F.3d at 1005–06. *See also N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 206 (2008) (permitting nomination by party convention). In short, the Constitution permits Tucson to set different geographical units for its primary and general elections.

I respectfully dissent.